**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**WORTHINGTON CYLINDER CORP.,**

        **Plaintiff,**                      **Case No. 2:12-cv-554**
                                            **JUDGE GREGORY L. FROST**
    **v.**                            **Magistrate Judge Mark R. Abel**

**SCHRADER-BRIDGEPORT**
**INTERNATIONAL, INC.,**

        **Defendant.**

**OPINION AND ORDER**

This matter is before the Court for consideration of the following filings:

(1) a motion to exclude testimony (ECF No. 70) filed by Defendant, Schrader-Bridgeport International Corp. ("Schrader-Bridgeport"); a memorandum in opposition (ECF No. 84) filed by Plaintiff, Worthington Cylinders Corp. ("Worthington Cylinders");[1] and a reply memorandum (ECF No. 87) filed by Schrader-Bridgeport; and

(2) a motion for summary judgment (ECF Nos. 54, 55) filed by Schrader-Bridgeport, a memorandum in opposition (ECF No. 78) filed by Worthington Cylinders, and a reply memorandum (ECF No. 82) filed by Schrader-Bridgeport.[2]

For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the

---

[1]  The operative complaint in this case identifies Plaintiff as "Worthington Cylinder Corporation."  (ECF No. 18, at Page ID # 102 ¶ 1.)  Plaintiff's own briefing provides that the company name is "Worthington Cylinders Corp."  (ECF No. 78, at Page ID # 5533.)  The Court has captioned the case according to the amended complaint, but refers throughout this Opinion and Order to Plaintiff by the name it used in its briefing.

[2]  ECF No. 54 is a redacted version of ECF No. 55, which is the unredacted version of the motion for summary judgment filed under seal.

1

motion to exclude testimony (ECF No. 70) and **DENIES** the motion for summary judgment (ECF Nos. 54, 55).

## I. Background

Worthington Cylinders is an Ohio corporation that is in the cylinder business. The company manufactures and sells cylinders, including those used with hand held torch applications. Over the course of the past decade, Worthington Cylinders has manufactured two sizes of cylinders for such use, a 14.1 ounce cylinder and a 16 ounce cylinder, that were used with MAP/Pro, Propylene, and MAPP gases. The company bought the valve cores for these cylinders from Schrader-Bridgeport, a Delaware corporation that, among other things, designs and manufactures valve components.

In December 2011, Worthington Cylinders learned of a problem with its 14.1 ounce and 16 ounce cylinders. There were reports of leaks in MAP/Pro, Propylene, and MAPP cylinders. Testing by both Worthington Cylinders and Schrader-Bridgeport confirmed the leakage issue, and the two companies entered into discussions about the problem. The parties dispute whether Schrader-Bridgeport definitively informed Worthington Cylinders that the epichlorohydrin rubber washer used in the valve seal was chemically incompatible with propylene gas so that the gas was degrading the washer material and creating a groove that permitted leaking. There is no dispute, however, that the leakage issue led to three events. One, Worthington Cylinders changed its valve core from the epichlorohydrin rubber seal previously used to a Viton rubber seal. Two, Worthington Cylinders issued a worldwide recall of its cylinders with the epichlorohydrin seal. Three, Worthington Cylinders subsequently filed the instant lawsuit.

In a four-count amended complaint, the company asserts claims against Schrader-

2

Bridgeport for breach of contract, breach of express warranties, breach of implied warranties, and detrimental reliance and misrepresentation.  (ECF No. 18 ¶¶ 19-46.)  Schrader-Bridgeport has filed a motion for summary judgment (ECF Nos. 54, 55) and a motion to exclude testimony from Worthington Cylinders' four expert witnesses (ECF No. 70).  The parties have completed briefing on the motions, which are ripe for disposition.

## II.  Motion to Exclude Testimony

### A.  Standard Involved

In its memorandum in opposition to the summary judgment motion, Worthington Cylinders relies upon four experts.  Schrader-Bridgeport moves to exclude testimony by each of these experts on the grounds that the experts's testimony is inadmissible under Federal Rule of Evidence 702 and the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The United States Supreme Court held in *Daubert* that the Federal Rules of Evidence had superseded the "general acceptance" test of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and that Rule 702 requires that trial judges perform a "gate-keeping role" when considering the admissibility of expert testimony.  *Daubert,* 509 U.S. at 597.  The relevant Federal Rule of Evidence is Rule 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Further, the Supreme Court has made clear that Rule 702 applies not only to scientific testimony but also to other types of expert testimony based on technical or other

specialized knowledge.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 149 (1999).

The trial court's gate-keeping role is two-fold.  First, the Court must determine whether the proffered testimony is reliable.  *See Daubert*, 509 U.S. at 590.  The reliability assessment focuses on whether the reasoning or methodology underlying the testimony is scientifically valid.  *Id.* The expert's testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief.  *Id.*  Thus, the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

In *Daubert*, the Supreme Court set out four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable.  They are:

> (1) whether the theory or technique has been tested;
> (2) whether the theory or technique has been subjected to peer review and publication;
> (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and
> (4) whether the theory or method has been generally accepted by the scientific community.

*Daubert*, 509 U.S. at 593-94.  *See also Deal v. Hamilton Cnty. Bd. of Ed.*, 392 F.3d 840, 851 (6th Cir. 2004).  The Supreme Court subsequently stressed in *Kumho Tire* that in assessing the reliability of expert testimony, whether scientific or otherwise, the trial judge may consider one or more of these *Daubert* factors when doing so will help determine that expert's reliability.  *Kumho Tire*, 526 U.S. at 150.  The test of reliability is a "flexible" one, however, and the four *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case.  *Id.* (quoting *Daubert*, 509 U.S. at 593); *see also Ellis v. Gallatin Steel Co.*,

4

390 F.3d 461, 470 (6th Cir. 2004). The particular factors will depend upon the unique circumstances of the expert testimony involved. *See Kumho Tire Co.*, 526 U.S. at 151-52.

The second prong of the gate-keeping role requires an analysis of whether the expert's reasoning or methodology can be properly applied to the facts at issue, that is, whether the opinion is relevant to the facts at issue. *See Daubert*, 509 U.S. at 591-93. This relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial. *See United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993). Thus, an expert's testimony is admissible under Rule 702 if it is predicated upon a reliable foundation and is relevant.

The United States Supreme Court and courts of appeals have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that area of expertise or that are not founded on a reliable methodology. *See, e.g., Kumho Tire Co., Ltd.*, 526 U.S. at 154-55 (finding the proffered expert qualified as an expert in mechanical engineering, but that his methodology in analyzing a particular tire failure was not reliable); *Weisgram v. Marley Co.*, 169 F.3d 514, 518 (8th Cir. 1999) (holding that a city fire captain, although qualified as an expert on fire investigation and therefore qualified to testify as to his opinion that a fire started in the entryway and radiated to a sofa, was not qualified to testify as to his unsubstantiated theories of a malfunction that might have caused the fire); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1317-19 (11th Cir. 1999) (proposed expert testimony of pathologist not permitted upon basis of unreliable methodologies in silicon breast implant case); *Cummins v. Lyle Indus.*, 93 F.3d 362, 371 (7th Cir. 1996) (industrial engineer not permitted to render an expert opinion regarding the adequacy of warnings, the adequacy of an instruction

manual, and the feasibility of alternative designs for a trim press).

The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury; rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The judge's role is simply to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Wellman v. Norfolk & W. Ry. Co.*, 98 F. Supp. 2d 919, 923-24 (S.D. Ohio 2000).

Cognizant of the foregoing concerns, this Court shall proceed to address each of the challenged experts in turn after first addressing a threshold issue that mutually pervades both the motion to exclude and the motion for summary judgment.[3]

### B. Scope of Claims

The parties devote considerable portions of their briefing on the motion to exclude and the motion for summary judgment arguing whether much of Worthington Cylinders' experts' testimony is beyond the scope of the company's claims. Schrader-Bridgeport contends that its opponent has impermissibly attempted to change what this case is about without having amended its pleading, while Worthington Cylinders asserts that this action has always been about more than only chemical incompatibility. The first issue in need of disposition thus turns on the distinction between a *claim* pled in a complaint and the multiple *theories* that may underlie that

---

[3] The motion to exclude is in essence a motion *in limine* filed during the course of summary judgment briefing. As with all *in limine* decisions, the rulings today are subject to modification should the facts or circumstances at trial differ from that which has been presented in the pre-trial motion to exclude and related memoranda.

claim.

Review of the operative complaint indicates that the crux of the factual allegations plead is that Schrader-Bridgeport sold Worthington materially defective valve cores that were incompatible with propylene gas.  Counts One, Two, and Three of the amended complaint target the unsuitability of the valve cores with the gases, while Count Four presents a claim for relief based on misrepresentation even if there is no such chemical incompatibility.  In other words, Count Four says that even if there is no chemical incompatibility,  Schrader-Bridgeport told Worthington Cylinders there was, Worthington Cylinders detrimentally relied on that misrepresentation in ordering a consequent worldwide recall, and Worthington Cylinders incurred substantial losses as a result.  Thus, all four counts target either the alleged chemical incompatibility of the old rubber seal with the gases or the purported misrepresentation that there is such incompatibility.  None of these counts present claims for relief that expressly indicate other reasons for valve leakage beyond chemical incompatibility.

This last point potentially matters because much of the expert testimony in dispute presents opinions as to issues with the valves other than the chemical incompatibility of the rubber washer seal.  Worthington Cylinders takes the position that it has claimed all along that its counts were about more than compatibility issues and that it was not required to plead the details of design defect issues.  In other words, a claim encompasses more than a single theory.[4]

---

[4]  Worthington Cylinders insists that it not be held to a restrictive view of its initial or even amended pleading because other potential defects were uncovered through discovery. Moreover, Worthington Cylinders argues, if Schrader-Bridgeport was unclear about the nature or scope of the claims, Schrader-Bridgeport could and should have filed a Federal Rule of Civil Procedure 12(e) motion for a more definite statement.  The Court declines to endorse this latter contention in light of the proposition that "Rule 12(e) 'is designed to strike at unintelligibility rather than simple want of detail . . . .' "  *Exal Corp. v. Roeslein & Assocs., Inc.*, No. 4:12-CV-

As noted above, the parties' pleading debate presents the issue of whether it matters that a plaintiff has failed to plead all precise theories underlying a claim. Under the circumstances of this case, it does not. All of the claims pled in the amended complaint present claims for relief that fairly encompass Worthington Cylinders' multiple theories. The breach of contract claim in Count One, for example, asserts that Schrader-Bridgeport "breached the parties' contracts by supplying [Worthington Cylinders] with materially defective valve cores which were unsuitable for use with cylinders containing MAP/Pro, Propylene and MAPP gases." (ECF No. 18 ¶ 23.) Although this count incorporates earlier paragraphs identifying chemical incompatibility as problematic, nowhere does the count limit the breach of contract claim to that theory.[5] Rather, the pleading presents the broad claim and a sufficient factual allegation to render that claim plausible. That is all that is required under Federal Rule of Civil Procedure 8 notice pleading.

Just as a plaintiff bringing a discrimination claim need not plead each and every instance of or type of activity involved in the discrimination, Worthington Cylinders did not have to delineate each and every factual allegation presenting its claim. It would have been convenient for Schrader-Bridgeport (and for this Court) if the company had, but the Federal Rules of Civil

01830, 2012 WL 4754748, at *4 (N.D. Ohio Oct. 2, 2012) (quoting *Jakovich v. Hill, Stonestreet & Co.*, No. 1:05CV2126, 2005 WL 3262953, at *3 (N.D. Ohio Nov. 30, 2005)).

[5] In an effort to explain why its pleading is broader than the incompatibility issue, Worthington Cylinders asserts that "[i]n fact, the word 'compatibility' does not appear in Counts One, Two, or Three." (ECF No. 84, at Page ID # 6209.) This is true. But all three counts contain a provision incorporating all that has come before in the amended complaint. (ECF No. 18 ¶¶ 19, 25, 31.) An incorporated earlier paragraph in that pleading described the seal and gases as "not compatible," another asserted that the seal was "no suitable" for the gas cylinders, and yet another indicated that a new seal material "that would be compatible" was suggested by Schrader-Bridgeport. (ECF No. 18 ¶¶ 15-17.) Worthington Cylinders' dubious technical point about the use of one form of a single word is thus wholly unhelpful in the larger analysis.

8

Procedure do not mandate such considerate pleading.  This is one of the reasons why discovery

exists.  See *Exal Corp.*, 2012 WL 4754748, at *4 ("Carefully drafted discovery can readily fill in

any gaps and eliminate ambiguity.").

The discovery here filled in the additional factual contentions absent from the pleading.

Multiple expert reports presented Worthington Cylinders' alternate theories of the contractual

breach in Count One and the warranty breaches in Counts Two and Three.  Notably, such details

of the claims came well before the close of discovery, which meant that Schrader-Bridgeport had

sufficient time to develop its defenses.  *See Yanovich v. Zimmer Austin, Inc.*, 255 F. App'x 957,

970 (6th Cir. 2007) (prohibiting a plaintiff from raising additional legal theories after discovery

and the filing of a motion to dismiss); *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989) ("A

party is not entitled to wait until the discovery cutoff date has passed and a motion for summary

judgment has been filed on the basis of claims asserted in the original complaint before

introducing entirely different legal theories in an amended complaint.").  There has thus been no

impermissible sandbagging here.

Nor has there been an attempt to transform a claim into another claim or to introduce

belatedly a new body of law into the case.  There has only been the typical development of

claims in a permissible manner characteristic of much litigation.  The Tenth Circuit has

recognized that such development is in fact inherent to federal litigation:

> As a general rule, a plaintiff should not be prevented from pursuing a valid
> claim just because she did not set forth in the complaint a theory on which she could
> recover, "provided always that a late shift in the thrust of the case will not prejudice
> the other party in maintaining his defense upon the merits."  The purpose of "fact
> pleading," as provided by Fed. R. Civ. P. 8(a)(2), is to give the defendant fair notice
> of the claims against him without requiring the plaintiff to have every legal theory
> or fact developed in detail before the complaint is filed and the parties have
> opportunity for discovery.

*Evans v. McDonald's Corp.*, 936 F.2d 1097, 1091 (10th Cir. 1991) (citations omitted).  The record of this litigation does not present a late shift or prejudice to Schrader-Bridgeport.

As the timeline and summary of the case presented in Worthington Cylinders' briefing indicate, Schrader-Bridgeport has long been on notice of what this case is about and the multiple theories that Worthington Cylinders presents.  (ECF No. 84, at Page ID # 6212-13.)  This Court need not reproduce those details here; this issue has already consumed too much of the parties' time and the Court's attention.  The point is that Worthington Cylinders presented its theories underlying its claims in sufficient time to avoid any prejudice to Schrader-Bridgeport.

Whether Schrader-Bridgeport is correct that Worthington Cylinders is just throwing its multiple theories against the wall in an effort to see whether any or all of them stick is distinct from whether Worthington Cylinders can do so based on its pleading.  This Court therefore rejects Schrader-Bridgeport's thesis that all of the expert discovery, the summary judgment motion, and the case as a whole must be limited only to the issue of chemical incompatibility.

### C.  Nicholas E. Biery

Nicholas E. Biery is an engineer and materials scientist retained by Worthington Cylinders.  He holds multiple degrees in materials science and engineering, including a Ph.D. Schrader-Bridgeport argues that exclusion of Biery's testimony is warranted on the grounds that it is irrelevant to the claims actually pled.  This Court has rejected that premise above.  Schrader-Bridgeport also asserts, however, that exclusion is warranted because Biery employed unreliable methodology.

The company's specific argument is that Biery reached his opinions despite failing to engage in any accepted and standard tests of the compatibility of the seals and the gases and

despite his failure to properly execute other tests in which he engaged.  Worthington Cylinders counters that Biery reviewed the results of extensive tests conducted by the parties in this case and four independent laboratories.  Biery also tested hundreds of propylene cylinders, performed visual inspections of valves under a microscope, and conducted a plant visit to observe how cylinders are manufactured, tested, and stored.

This Court will not exclude Biery's testimony.  There is no requirement under Rule 702 or *Daubert* that an expert employ an optimal method; the methodology used must only be reliable and reasonable under the circumstances.  *See, e.g., Icare-EMS, Inc. v. Rural Metro Corp.*, No. 1:11-CV-45, 2012 WL 2343164, at *2-4 (E.D. Tenn. June 20, 2012).  Thus, to the extent that the methodologies Biery employed may have been less than optimal, it raises questions of weight and not admissibility.  *See id.* at *3; *see also Burke ex rel. Burke v. U-Haul Int'l, Inc.*, No. 3:03CV-32-H, 2006 WL 3043421, at *7 (W.D. Ky. Oct. 20, 2006).  Moreover, it is acceptable for an expert to base an opinion on testing performed by other individuals. *Daubert*, 509 U.S. at 592.

### D.  Jody McKinley

Worthington Cylinders' second expert witness under attack is Jody McKinley, another mechanical engineer, who works at Worthington Cylinders.  Aside from its failed contention of irrelevance to the claims, discussed above, Schrader-Bridgeport also argues that exclusion of McKinley's testimony is warranted because he lacks the qualifications and employed a flawed methodology to arrive at his opinions.

McKinley testified that he is not an expert on valve cores during both his fact witness deposition and during his expert witness deposition.  This Court wholly does not care whether a

11

witness subjectively describes himself or herself as an expert.  *See Pride v. BIC Corp.*, 218 F.3d 566,  (6th Cir. 2000) (explaining that the liberal treatment afforded the requirement that a witness establish his expertise " 'does not mean that a witness is an expert simply because he claims to be' " (quoting *In re Paoli RR. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990))). Rather, what matters is whether the witness objectively possesses the requisite knowledge, skill, experience, training, or education to offer an opinion that will assist the trier of fact to understand the evidence or to determine a fact at issue.  Review of McKinley's full testimony (as opposed to focusing on his self-labeling testimony in isolation) indicates that there is nothing in McKinley's background that qualifies him as having sufficient expertise on the chemical interaction or incompatibility issue involved in this litigation.  Therefore, he cannot offer his own opinion testimony on the issue of cause in that regard.  McKinley can, however, of course testify as a fact witness as to his role on the internal technical team that addressed the valve issue, the work done by the team, and the conclusions the team reached.  These conclusions may or may not reach the chemical interaction issue, and while McKinley could therefore report on the committee work on that issue, he cannot personally vouch for the correctness of its conclusions in that regard.

McKinley can also testify as to the valve design issues.  He is a mechanical engineer with a sufficient background to offer expertise in regard to these defect and causation issues, even if he does not employ his training in a manufacturing capacity.  *See Cummins ex rel. C.A.P. v. BIC USA, Inc.*, No. 1:08-CV-00019, 2011 WL 1399768, at *7 (W.D. Ky. Apr. 13, 2011) ("To require [an expert] to have experience in such a narrow field is not what is required by Rule 702; his background need only be significant enough to provide reliable testimony that will assist the trier

of fact."); *see also Billstein v. Goodman*, No. 08-13415, 2012 WL 1048468, at *2 (E.D. Mich. Mar. 28, 2012) (rejecting the proposition that possessing the most appropriate specialization is a prerequisite to providing expert testimony). There are core principles and training that extend to the facts involved here and "[a]n expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact." *Dilts v. United Group Services, LLC*, 500 F. App'x 440, 445 (6th Cir. 2012) (citing *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293–94 (6th Cir. 2007)).

Additionally, the Court concludes that McKinley employed a reliable methodology in forming his design-related opinions. There is nothing wrong with an informed individual relying upon the data and conclusions offered by other informed individuals, and McKinley holds the requisite background to interpret such information. To the extent that Schrader-Bridgeport criticizes this interpretive approach, Worthington Cylinders is correct in pointing out that the critique conflates the weight to be afforded the testimony by the jury and not its admissibility.

### E. James A. Petersen

James A. Petersen is a mechanical engineer retained by Worthington Cylinders as a third expert witness. Similar to its challenge to Biery's testimony. Schrader-Bridgeport attacks the methodology that Peterson employed in forming his opinions. Unlike its challenge to Biery, however, Schrader-Bridgeport also attacks Petersen's qualifications.

Review of the entirety of the Petersen materials submitted to this Court indicates that Petersen holds the qualifications to express the opinions that Worthing Cylinders seeks to offer from this witness. He is certainly qualified to opine on design issues.

Notably, it appears that Petersen's opinions do not include an opinion on the chemical

interaction or incompatibility issue, which was not part of Petersen's expert report or his rebuttal report.  The Court qualifies this latter statement with "appears" because the briefing is not as clear as expected on this issue.  In its memorandum in opposition, Worthington Cylinders defends Petersen's ability to opine on the use of elastomers with propylene, but then appears to say that Petersen will not opine on the chemical interaction issue.  (ECF No. 84, at Page ID # 6221 n.22.)  The Court understands Petersen's point in his deposition testimony that the material of the valve is intertwined with the overall design of the valve, but also credits Worthington Cylinders' representation that it will confine Petersen's testimony to the task he was assigned–a task that he defined as not including the specific evaluation of the rubber.  To the extent that the Court has misread the briefing and Worthington Cylinders will seek to elicit from Petersen an opinion on the elastomers-propylene issue, the Court will revisit the issue when so advised.

This leaves the challenge to the methodology that Petersen employed.  Similar to others, Petersen based his opinions on a review of voluminous data from various sources.  The underlying principles that allegedly governed Petersen's analysis suffice to render his opinions sufficiently reliable for presentation to a jury.   Although he did not engage in individual testing or examination, these choices go to the weight to be afforded his testimony and not its admissibility.  They are also informed by the evidence regarding reseating; there appears to be little dispute over the underlying science as opposed to over the consequences asserted.  Moreover, again similar to the Biery discussion presented above, the fact that Petersen could have engaged in a different methodology does not invariably render the methodology he did employ unreliable.  Rather, the choices made simply provide fodder for cross-examination.

The finder of fact can thus still regard Petersen's reliable testimony as helpful even if it

will fall upon the finder to make a determination that Petersen himself declines to do, *i.e.*, what is the precise cause of the leaks.  An inability to rule out other potential causes of the leakage goes to the weight rather than the admissibility of Petersen's opinions and testimony.  *Tolstih v. L.G. Elec., U.S.A., Inc.*, No. 2:07-cv-582, 2009 WL 3241665, at *5 (S.D. Ohio Oct. 2, 2009) (citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000)).

### F.  Alan Schoem

Worthington's final expert witness, attorney Alan Schoem, testified as to product recalls at the Consumer Product Safety Commission.  Schrader-Bridgeport expressly represents that it is not challenging Schoem's testimony on this issue.  Rather, Schrader-Bridgeport targets Schoem's additional testimony on the compatibility of epichlorohydrin rubber and propylene gas and the use of Viton elastomers instead of epichlorohydrin elastomers.

Schoem lacks the requisite background, education, and training to offer opinions regarding the cause of the valve leakage.  It is unclear to what extent, if any, Worthington Cylinders would offer such testimony.  Schrader-Bridgeport's motion is well taken in regard to any valve and elastomer testimony insofar as Schoem cannot express an opinion on whether incompatibility actually existed or the underlying science.  Schoem can only testify about, and this Court can consider only his prior testimony concerning, the Consumer Product Safety Commission and recalls generally and the fact that the recall involved here was purportedly based on identified incompatibility specifically.  In other words, although he cannot say there was a defect or that there was incompatibility, he can testify as to what the designated basis for the recall was.

### III.  Motion for Summary Judgment

15

### A.  Standard Involved

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B.  Analysis

Schrader-Bridgeport initially seeks summary judgment on the first three claims of the amended complaint based on an overarching rationale.  The company argues that each of the three claims are based on the premise that only one valve defect is involved, the washer-gas

incompatibility, and that the evidence fails to present such incompatibility.  Two points defeat this rationale.

First, in light of this Court's foregoing conclusions regarding the scope of Worthington Cylinders' claims and the non-exclusion of much of the proffered expert testimony, there are genuine issues of material fact related to design issues that preclude summary judgment.  This Court has already discussed the parties' debate over the scope of the claims at length above, and the Court need not reproduce that incorporated discussion here.  Because this case and these three claims involve more than the chemical incompatibility issue, Schrader-Bridgeport has failed to address the full scope of the first three claims.

Second, design issues aside, there remains a genuine issue of material fact over the chemical incompatibility issue.  Construing all reasonable inferences in favor of Worthington Cylinders means that the Court must recognize the factual disputes as to whether there is a chemical incompatibility issue and whether such incompatibility is the cause of the leaks.  The parties' briefing on these issues presents a notable disconnect in how they view the case, so much so that rather than needlessly reproduce each piece of evidence here, the Court need only summarize the significant evidentiary disagreements.

On its side, Worthington Cylinders has presented this Court with evidence of leaking cylinders dating back more than a decade, data, alleged admissions, and expert opinions, such as those discussed above, that all connect the leakage problem to the rubber washer and its interaction with the gas.  The thrust of Schrader-Bridgeport's argument is essentially that the Court should disregard much of this evidence and credit the company's own evidence that undercuts the existence of any incompatibility and causation.  But that is not how summary

17

judgment works.  It is simply not the role of this Court to credit one piece of conflicting evidence over another.  Thus, this Court can not and will not regard any evidence, such as the UL testing results, as dispositive.  Rather, these three claims will go to a jury, which holds the responsibility of untangling the battle of the experts that constitutes this case.

Schrader-Bridgeport next argues that it is entitled to summary judgment on the first two claims because the parties' agreement did not include the terms upon which Worthington Cylinders relies.  Count One is the breach of contract claim, and Count two is the breach of express warranties claim.  Worthington Cylinders' theory behind these two claims is that Schrader-Bridgeport breached the parties' contract and violated express warranties by supplying defective valve cores that were not merchantable and fit for their intended use.

In seeking summary judgment, Schrader-Bridgeport argues that it never accepted Worthington Cylinders' terms and conditions because, after receiving Worthington Cylinders' purchase orders, Schrader-Bridgeport responded by issuing its own invoices.  The purchase orders allegedly referenced terms and conditions that did not accompany the orders, while the back side of the invoices included terms and conditions.[6]  Worthington Cylinders counters that Schrader-Bridgeport is ignoring the fact that it responded to the initial purchase orders with facsimile acceptances, which formed a contract on Worthington Cylinders' terms and conditions.

The issue is whether the Schrader-Bridgeport invoices constituted counter-offers that were expressly conditioned on Worthington Cylinders agreeing to the invoice terms and

_____

[6]  Schrader-Bridgeport notes in its briefing that its terms and conditions provide that Virginia law applies, while Worthington Cylinders' terms and conditions provide that Ohio law applies.  Schrader-Bridgeport asserts that it is not necessary to determine which state's law applies because both states have adopted the same relevant portions of the Uniform Commercial Code.

conditions so that the parties' agreement disclaimed warranties. Resolving this question necessitates beginning with the contents of Worthington Cylinders' purchase orders.

Worthington Cylinders has submitted two purchase orders as exhibits to a declaration from its buyer, who describes the example purchase orders as "typical purchase orders." (ECF No. 78-29, at Page ID # 6066 ¶ 2.) These purchase orders include a statement that "Worthington Cylinder Terms and Conditions of Purchase Apply." (ECF No. 78-29, at Page ID # 6069-72.) The purchase orders themselves do not set forth the applicable terms and conditions. Worthington Cylinders has also presented this Court with a separate document, however, that sets forth the incorporated four pages of terms and conditions, which reads in relevant part as follows:

> **ACKNOWLEDGMENT AND AGREEMENT TERMS**: Kindly acknowledge receipt of this order at once, advising definite shipping date, and prices (if not shown herein). The acknowledgment copy of the purchase order, indicating the acceptance of this order and all of the terms and conditions herein stated, must be signed and returned immediately. Your acceptance of this order shall be limited to the terms contained on the face and back hereof. Any conduct by you which recognizes the existence of a contract pertaining to the subject matter hereof shall constitute acceptance of this order and all of the terms herein stated. Additional or different terms proposed by you in your quote, offer or acceptance or in any other manner to vary in any degree the terms and conditions of this order are hereby objected to and rejected. No person is authorized to bind us to any order for any goods except according to the terms and conditions of both sides hereof, and they may not be added to, modified, superseded, or altered, except by a written agreement or modification signed by our President or a Vice President.

(ECF No. 78-29, at Page ID # 6077.) There is evidence that Worthington Cylinders sent Schrader-Bridgeport these terms and conditions via email on August 10, 2011. (ECF No. 78-29, at Page ID # 6076.) This date is after the July 2011 date of one of the purchase orders submitted as evidence (ECF No. 78-29, at Page ID # 6071-72), but before the March 2012 date of another invoice (ECF No. 78-29, at Page ID # 6069).

19

According to Worthington Cylinders, the sample purchase orders submitted as summary judgment evidence also constitute "faxed confirmations."  (ECF No. 78-29, at Page ID # 6066 ¶ 2.)  Following the "Worthington Cylinder Terms and Conditions of Purchase Apply" line and the signature of the company's buyer, the purchase orders contain handwritten notes by a Schrader-Bridgeport employee indicating the shipment date, his initials, and the date.  The Schrader-Bridgeport employee would then return the purchase orders to Worthington Cylinders via facsimile.  Schrader-Bridgeport characterizes the facsimile as a simple "standard acknowledgment" of the proposed offer, which the company asserts opened the door for a counter-offer.  (ECF No. 82-1, at Page ID # 6144.)  But these actions indicate that Schrader-Bridgeport acknowledged receipt of the order and advised Worthington Cylinders of a definite shipping date.  Under Worthington Cylinders' terms and conditions, this facsimile acknowledgment of the purchase order constitutes acceptance of the order and all of Worthington Cylinders' terms and conditions.  These terms and conditions both prohibited Schrader-Bridgeport from introducing new or conflicting terms via its invoices and imposed multiple express warranties while concurrently disavowing the exclusion of all implied warranties.  (ECF No. 78-29, at Page ID # 6078.)

Schrader-Bridgeport's facsimile response constitutes "[a] definite and seasonable expression of acceptance . . . that is sent within a reasonable time" and neither states additional or different terms from those that Worthing Cylinders offered nor expressly makes the acceptance conditioned on any additional or different terms.  *See* Ohio Rev. Code § 1302.10(A).  There was no express conditional acceptance in the facsimile responses.  The additional or different Schrader-Bridgeport invoice terms and conditions therefore did not become part of the

contract under Ohio Revised Code § 1302.10(B), given that these terms and conditions came well after Schrader-Bridgeport's unconditional acceptance.  All of this warrants making two basic points.

The first point is that Schrader-Bridgeport's argument that the facsimile response is a simple acknowledgment but not an acceptance is a semantical dodge from crediting the fact that Schrader-Bridgeport was complying with the incorporated Worthington Cylinders terms and conditions.  That compliance equaled an acceptance under those terms and conditions and meant that under Ohio Revised Code § 1302.10(A), a contract was formed.  The parties' debate in their briefing as to whether the facsimile responses constitutes "a written confirmation" under Ohio Revised Code § 1302.10(A) does not matter in light of the fact that the facsimile already constitutes "[a] definite and seasonable expression of acceptance" under that same portion of the statute.

Informing this reasoning is the Sixth Circuit's recognition that Ohio Revised Code § 1302.10 "does not exist in isolation" and that Ohio Revised Code § 1302.09 cannot be ignored. *Mantaline Corp. v. PPG Indus., Inc.*, 225 F.3d 659, 2007 WL 799337, at *2 (6th Cir. 2000) (unpublished table decision).  That latter statute provides that "[u]nless otherwise unambiguously indicated by the language or circumstances" of an offer:

> (1) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;
>
> (2) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods, but such a shipment of non-conforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the shipment is offered only as an accommodation to the buyer.

Ohio Rev. Code § 1302.09(A).  This matters because Worthington Cylinders' terms and conditions did not restrict the medium for communicating an acceptance beyond the requirement that it be in writing, which permits acceptance by facsimile, and because Schrader-Bridgeport responded to the purchase orders with a prompt promise to ship made in such a writing.

The second point is that the parties should keep in mind that today's decision means only that Schrader-Bridgeport is not entitled to summary judgment, not that Worthington Cylinders is entitled to judgment.  None of this discussion presents any inviolate factual determinations.  Rather, the Court has necessarily drawn all reasonable inferences in Worthington Cylinders' favor and has concluded only that there is enough here to preclude summary judgment for Schrader-Bridgeport.

This of course means that Schrader-Bridgeport may be able to puncture today's analysis at trial by presenting facts undercutting the apparent facts and reasonable inferences.  For example, it is only an inference that Worthington Cylinders' terms and conditions have remained consistent so that all recalled cylinders were under purchase orders falling within the terms and conditions that are before this Court on summary judgment.  Other terms and conditions might have applied at one time or another or other purchase orders with or without incorporation language may have been employed.  The reliance here on the "typical" purchase orders presented to this Court as examples does not foreclose getting into the minutia of each and every purchase order at trial.

Schrader-Bridgeport also seeks summary judgment on Count Four, which presents a negligent misrepresentation claim.  The Sixth Circuit has recognized that a plaintiff asserting a negligent misrepresentation claim under Ohio law must

demonstrate that defendants, "in the course of [their] business, profession or employment, or in any other transaction in which [they had] a pecuniary interest, supplie[d] false information for the guidance of others in their business transactions," did so without exercising "reasonable care or competence in obtaining or communicating the information," that [the plaintiff] justifiably relied on that information, and that "pecuniary loss" resulted from that reliance.

*Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 387 (quoting *Delman v. City of Cleveland Heights*, 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (1989)).  Worthington Cylinders' theory underlying this claim is simple: the company issued the recall in reliance on Schrader-Bridgeport's representation that the chemical incompatibility issue was causing the leaks.  Thus, if Schrader-Bridgeport is correct that there is no chemical incompatibility issue, then Schrader-Bridgeport engaged in a negligent misrepresentation upon which Worthington Cylinders justifiably relied to its detriment.

Disagreeing, Schrader-Bridgeport argues that it is entitled to summary judgment on this claim because Worthington Cylinders did not in fact act in reliance on any misrepresentation.  In making this argument, Schrader-Bridgeport asserts that Worthington Cylinders did not consider the *cause* of the leaks to be relevant to the recall decision as opposed to the simple fact that *there were leaks for whatever reason*.  In other words, Worthington Cylinders issued a recall because there were leaks creating a substantial risk, not because Schrader-Bridgeport purportedly told the company that there was a chemical incompatibility issue underlying the leaks.  There can be no detrimental reliance on a misrepresentation concerning a point that did not factor into the actual decision making.

To support this argument, Schrader-Bridgeport directs this Court to the deposition of Worthington Cylinders' Chief Executive Officer, John P. McConnell, who testified that his decision to institute the recall was because of the potential for leaks and not the specific cause of

the leaks.  Other company officers testified similarly.

Worthington Cylinders nonetheless argues that, in making the recall decision, it indeed relied on Schrader-Bridgeport's representation that there was a chemical incompatibility between the rubber and the gas that was causing the leaks.  Worthington Cylinders directs this Court to the testimony of its Director of Quality, Paul Lilko, who reasoned that if a rubber-gas incompatibility issue was behind the leaks, then all the propylene cylinders were bad.  His testimony suggests that if there were another reason, then not all the cylinders would be bad and there might not have been the recall there was.  The company also points this Court to testimony by its President, Andrew Billman, who stated that based on Schrader-Bridgeport's assessment of the cause, Worthington Cylinders had to fully recall the cylinders.  This again suggests that another possible cause of the leakage might have resulted in a lesser recall than the worldwide recall undertaken.

Necessarily construing all reasonable inferences in favor of Worthington Cylinders, this Court concludes that there is a genuine issue of material fact as to whether the cause of the leak represented by Schrader-Bridgeport led Worthington Cylinders to issue the recall as opposed to the mere fact that leakage could occur for whatever reason.  Perhaps this is a close call, but a jury could credit the testimony involved in a more nuanced manner than Schrader-Bridgeport. There is testimony by corporate officers supporting both sides, and it is up to the finder of fact to credit whom to believe and whether there is a distinction inherent in the testimony between the fact of issuing a recall regardless of the reason for the leaks and the extent of that recall depending upon the reason. Schrader-Bridgeport is therefore not entitled to summary judgment on Count Four.

**IV.  Conclusion**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the

motion to exclude testimony (ECF No. 70) and **DENIES** the motion for summary judgment

(ECF Nos. 54, 55).

**IT IS SO ORDERED**.

　　　　　　　　　_____/s/ Gregory L. Frost_____
　　　　　　　　　GREGORY L. FROST
　　　　　　　　　UNITED STATES DISTRICT JUDGE